UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DAVID A. KINDER,                        )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        CAUSE NO. 1:13-CV-197
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
        Defendant.                      )

## OPINION AND ORDER

Plaintiff David Kinder appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Kinder applied for SSI and DIB in May 2008, alleging that he became disabled as of

March 21, 2008. (Tr. 128-40.)  The Commissioner denied Kinder's application initially and upon

reconsideration, and Kinder requested an administrative hearing. (Tr. 68-69, 78-79.)  On October

26, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Angela Miranda, at

which Kinder, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 40-

67.)  On October 28, 2011, the ALJ rendered an unfavorable decision to Kinder, concluding that

---

[1] All parties have consented to the Magistrate Judge. (Docket # 19); *see* 28 U.S.C. § 636(c).

he was not disabled because he could perform a significant number of sedentary jobs in the economy. (Tr. 17-33.)  The Appeals Council denied Kinder's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 404.981, 416.1481.

Kinder filed a complaint with this Court on June 17, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Kinder contends that the ALJ (1) failed to give proper weight to the medical opinions of record and instead substituted his own lay opinion for those of medical professionals; (2) assigned an erroneous residual functional capacity ("RFC") and consequently provided an inaccurate hypothetical to the VE; and (3) improperly discounted the credibility of his symptom testimony. (Pl.'s Social Security Mem. ("Pl.'s Mem.") 6-20.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Kinder was forty-seven years old (Tr. 33, 128); had obtained his GED and received training in heating and air conditioning (Tr. 163); and possessed work experience as a customer truck driver, assistant custodian, and in apartment maintenance (Tr. 158).  On his application, Kinder alleged disability due to pancreatitis, which was diagnosed in 2006, and a back and neck injury incurred in a motor vehicle accident in March 2008. (Tr. 45-46, 162.)

At the hearing, Kinder testified that his daughter lives with him and helps with the

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 670-page administrative record necessary to the decision.

2

household chores such as laundry and vacuuming. (Tr. 53.) Each week he drives himself to the grocery once and to the doctor twice. (Tr. 53.) He takes back roads when driving because he randomly gets a dizzy spell at least once a day that lasts from four to eight seconds. (Tr. 53-55.) His typical day begins by fixing breakfast and getting his daughter off to school; then he sits and watches television, frequently changing positions. (Tr. 58.) After lunch he goes "up town" eight blocks to check his mail. (Tr. 58-59.) He fixes dinner for his daughter, and they watch television together in the evening. (Tr. 59.) He occasionally attends his daughter's school activities even though it is painful for him to do so. (Tr. 59.)

When asked what keeps him from working, Kinder stated that he has "constant headaches" and is "always in pain." (Tr. 48.) He rated his constant headache pain as a "five or a six" on a ten-point scale, but stated that it can rise to an "eleven," which he described as "unbearable." (Tr. 50.) Aside from his headaches, Kinder complained of pain centered in his neck and low back that radiates to his shoulders, legs, and feet; he has two toes that are numb on his right foot. (Tr. 48.) Elevating his legs helps reduce those symptoms, but nothing eliminates his pain (Tr. 49); rather, Vicodin "dulls" the low back pain and "just slightly helps" with his headache (Tr. 51). As to his pancreatitis, that pain "comes and goes," but when it comes it stays for three to four days at a time; the only way he has found to calm that pain is to not eat. (Tr. 52.)

From a physical capacity standpoint, Kinder estimated that he could stand or sit for twenty minutes before having to change position, and walk a quarter of a block before having to rest. (Tr. 49-50.) He thought he could lift up to ten pounds. (Tr. 53.) He also reported that some of his medications make him sleepy. (Tr. 55.) As to his mental health, Kinder stated that he is

depressed and easily becomes emotional. (Tr. 55.)

### B. Summary of the Medical Evidence[3]

Kinder was taken to the emergency room following a motor vehicle accident in March 2008. (Tr. 381.) He complained of neck pain and stiffness, and had some pain, numbness, tingling, and weakness in his left shoulder, scapular, and arm. (Tr. 381.) He was treated and released. (Tr. 381.)

One week later, Kinder saw his treating doctor for continued pain complaints. (Tr. 305.) He had cervical spasms; decreased range of motion in his neck; pain in his shoulder, neck, and back; and limitations in activities of daily living. (Tr. 312.) He was diagnosed with whiplash, cervico thoracic myalgia/myositis, and erector spinae myositis/myalgia. (Tr. 311.) Kinder saw his treating doctor, Tristan Stonger, several times a week during April and May 2008 for treatment of his pain through.[4] (Tr. 302-11.) Kinder continued to complain of pain, reduced range of motion, motor weakness, and limitations in activities of daily living. (Tr. 302-11.) By April 15, Kinder's headaches and neck movements were "better" (Tr. 308); on April 18, Kinder was "overall improving" (Tr. 307).

On May 6, however, he complained of dizzy spells. (Tr. 304.) On May 19, Kinder's left arm strength was still unchanged, and thus, he was referred to Dr. Jeff Kachmann, a neurologist. (Tr. 303.) On May 28, 2008, Dr. Supriyas Kumar diagnosed Kinder with chronic pain

---

[3] Because Kinder's appeal challenges only the ALJ's assessment of his shoulder, back, and to a lesser extent mental limitations, only this medical evidence is considered for purposes of the Court's review. It should be noted, however, that Kinder also has cardiac and obesity limitations, which were addressed at length by the ALJ.

[4] Kinder received pain treatment from Dr. Stonger once or twice a week from April 2008 through January 2009. (Tr. 509-25.) Because Dr. Stonger's notes from this time period are unremarkable or otherwise redundant of other doctors' treatment notes, only the remarkable portions are recounted here.

syndrome. (Tr. 322.)

In mid-May, an MRI of Kinder's cervical spine showed mild disc protrusion at C5-C6 and left-sided unconvertebral spurring, resulting in mild left foraminal stenosis; and a moderate-sized central and leftward disc extrusion at C6-C7. (Tr. 290.) The remainder of the cervical disc levels were unremarkable. (Tr. 290.) An MRI of his thoracic spine was normal except for multiple, small remote Schmorl's nodes in the anterior portion of the upper thoracic vertebral column. (Tr. 292.) And an MRI of his left shoulder showed a partial thickness tear on the capsular surface of the distal infraspinatus tendon and a small anterior/superior glenoid labral tear. (Tr. 293-94.)

In June 2008, Dr. Kachmann performed a C5-C7 anterior cervical decompression and fusion fixation on Kinder. (Tr. 368, 375.) In September, Kinder was still complaining of neck pain saying that it radiated interscapulary and caused headaches and dizziness, but denied any numbness, tingling, or pain in his upper extremities. (Tr. 368.) In October, Dr. Kachmann noted that Kinder's cervical MRI and CT scan showed no evidence of any type of neurologic impingement, and the instrumentation looked excellent. (Tr. 363.) Due to Kinder's continued neck pain, Dr. Kachmann prescribed anti inflammatories and a cervical collar. (Tr. 363.)

Also in June 2008, Kinder was examined by orthopedist, Dr. Jerald Cooper. (Tr. 428-30.) The physical examination showed left shoulder discomfort, but intact rotator cuff strength and no evidence of laxity. (Tr. 428.) Dr. Cooper also reviewed an MRI taken the previous month and opined that any symptoms from the tear standpoint were quite small. (Tr. 427.)

In August 2008, Kinder was examined by Dr. Elpidio Feliciano for purposes of his disability application. (Tr. 332-33.) Dr. Feliciano noted Kinder's history of alcoholism, chronic

pancreatitis, and neck and back pain. (Tr. 332.)  Kinder complained of "constant, sharp pain, knife stabbing, twisting pain," ranging from "eight" to "ten" on a ten-point scale, and up to three hours of morning stiffness. (Tr. 332.)  His pain was alleviated by medications and aggravated by movement. (Tr. 332.)  A musculoskeletal exam showed that Kinder's gait was normal. (Tr. 332.)  He could get up and down from the exam table, walk on heels and toes, tandem walk, hop, and squat. (Tr. 332.)  His cervical spine range of motion was decreased; he had tenderness and spasms. (Tr. 332-33.)  A straight leg raising test was negative, and muscle strength and tone were normal. (Tr. 333.)  His grip strength and fine finger skills were also normal. (Tr. 333.)

In October 2008, Dr. J.V. Corcoran, a state agency physician, reviewed Kinder's record and concluded that he could lift less than ten pounds frequently and ten pounds occasionally, stand or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and perform unlimited pushing and pulling. (Tr. 346-52.)  He further concluded that Kinder could occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; but never climb ladders, ropes, or scaffolds. (Tr. 347.)  He assigned no visual or upper extremity reaching, handling, fingering, or feeling limitations; the only environmental restriction he included was to avoid hazards such as slippery, uneven terrain, unprotected heights, and moving machinery. (Tr. 348.)

In July 2008, Dr. J. Cooper of Fort Wayne Orthopaedics administered several steroid injections to Kinder's left shoulder for pain relief. (*See, e.g.*, Tr. 416, 424.)  In December, Dr. Cooper assigned Kinder the following temporary work restriction: "no repetitive use of his left arm." (Tr. 411.)

That same month, Kinder was seen by Dr. David Lutz for a physical medicine and rehabilitation consultation. (Tr. 402-05.)  Kinder complained of "burning, stabbing, and

pinching" pain in his neck and left upper shoulder girdle, rating it an "eight" on a ten-point scale. (Tr. 402.)  He stated that movements of any kind exacerbated his symptoms. (Tr. 402.)  Upon exam, cervical facet provocation maneuvers and shoulder impingement signs were somewhat positive, and cervical range of motion was moderately reduced. (Tr. 403.)  Dr. Lutz observed active trigger points in the left cervical paraspinals and left upper trapezius ridges; sensation, however, was intact throughout the upper extremities. (Tr. 403.)

Dr. Lutz's impression was cervicalgia, cervical strain and probable whiplash injury to the cervical spine and possible superimposed cervical facet mediated pain; status post C5-7 cervical fusion; possible superimposed myofascial pain syndrome; and left shoulder pain and partial thickness tear of the capsular surface of the distal infraspinatus tendon. (Tr. 403.)  Dr. Lutz then administered trigger point injections to Kinder's left cervical paraspinals and left upper trapezius ridges and prescribed a course of physical therapy. (Tr. 403-04.)  Dr. Lutz explained that he would prescribe pain medications if Kinder signed a pain contract and provided a urine specimen for toxicology screen; Kinder declined, opting instead to see if his family physician would prescribe them. (Tr. 404.)  Dr. Lutz noted that Kinder would "remain off work for now." (Tr. 404.)

Also in December 2008, Kinder suffered an acute inferior myocardial infarction. (Tr. 455-461.)  He underwent a stent procedure. (Tr. 470.)  In January 2009, Kinder was evaluated by Dr. Brandi Rudolph, a psychiatrist, for purposes of his disability application. (Tr. 477-78.)  Kinder reported that he feels depressed and worthless, lacks energy, and has difficulty maintaining concentration. (Tr. 477.)  He has thought about suicide but never attempted it; he denies homicidal thoughts. (Tr. 477.)  He reported excessive worrying and monthly panic

attacks. (Tr. 477.)  A mental status exam revealed that Kinder was guarded, but cooperative; angry and depressed; and logical, goal-directed, and sequential. (Tr. 477.)  He exhibited good judgment and impulsivity, fair insight, and average intelligence. (Tr. 477.)  Dr. Rudolph assigned a Global Assessment of Functioning ("GAF") score of 62[5] and diagnoses of post traumatic shock syndrome ("PTSD"), major depressive disorder, and panic disorder without agoraphobia. (Tr. 481-82.)

The following month, William Shipley, Ph.D., a state agency psychologist, reviewed Kinder's record and found that his mental impairment was not severe. (Tr. 526-39.)  Specifically, he opined that Kinder's mental impairment caused just mild difficulties in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 536.)

In May 2009, Scott Nall, D.O., performed a consultative examination. (Tr. 577.)  On physical examination, Kinder had normal posture, ability to tandem walk and stand on heels and toes, normal gait, negative straight leg raise test in seated and supine positions, normal grip strength, 5/5 motor power in all extremities, ability to perform fine and gross motor movements effectively, and intact sensation. (Tr. 578-79.)  Dr. Nall found some reduced range of motion in the cervical and shoulder region, and assessed Kinder with chronic neck pain and left sided radiculopathy. (Tr. 578.)

On October 14, 2009, Kinder reported feeling depressed to Dr. Karl Cytrynowicz. (Tr.

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

654-57.)  Kinder was prescribed Cymbalta, and remained on Cymbalta at the same dosage level up through the time of the hearing. (Tr. 629-76.)

Starting on April 23, 2010, and continuing up through August 6, 2010, Kinder returned to seeing Dr. Stonger once or twice a week for pain treatment of his lumbar and cervical back. (Tr. 616-22.)  Of significance, Dr. Stonger recorded no physical examinations or assessments in his limited treatment notes during this time period.

On May 7, 2010, Dr. Stonger of the Indiana Pain Center wrote a letter "To Whom It May Concern," stating that he had been Kinder's physician since his March 2008 injury. (Tr. 606.) He explained that Kinder had a combination of problems arising from the initial whiplash injury and surgical complications, resulting in "long-term, severe, range of motion limiting fibrosis in the delicate neck muscles around the cervical area." (Tr. 606.)  Dr. Stonger stated that he had been treating, and would continue to treat, Kinder for these muscle problems and fibrosis areas because they limit his range of motion, cause chronic pain and sleep deficiency, and make it difficult to safely drive a car. (Tr. 606.)

On June 23, 2010, an MRI of Kinder's lumbar spine revealed mild facet joint osteoarthritis at L4-L5 on the right with mild neural foraminal narrowing. (Tr. 608.)

On July 16, 2010, Dr. Stonger completed a medical source statement, indicating that Kinder could lift and carry up to ten pounds occasionally, sit for one hour at a time and up to three hours in an eight-hour workday, stand for one hour at a time and up to two hours in an eight-hour workday, and walk for one hour both at a time and in an eight-hour workday. (Tr. 609-10.)  He could operate foot controls, stoop, kneel, crouch, crawl, and climb stairs and ramps occasionally; but never balance or climb ladders or scaffolds. (Tr. 611.)  He could not walk a

9

block at a reasonable pace on rough or uneven surfaces. (Tr. 614.)  With his right hand, Kinder could push and pull occasionally; handle, finger, and feel frequently; and reach occasionally, but never overhead. (Tr. 611.)  With his left hand, Kinder could push, pull, and handle occasionally; finger and feel frequently; and reach occasionally, but never overhead. (Tr. 611.)

Dr. Stonger further opined that Kinder could occasionally operate a motor vehicle, but must avoid exposure to vibration, extreme cold, moving mechanical parts, or unprotected heights; he could tolerate moderate noise, such as in an office. (Tr. 613.)  His symptoms included double vision with his headaches, which were caused by cervical neuritis. (Tr. 611.)  Dr. Stonger wrote that Kinder's movement of his head, arms, and legs were severely limited due to his chronic cervical and lumbar neuritis and chronic pain syndrome. (Tr. 614.)

On October 18, 2010, Dr. Stonger wrote a letter to the "Disability Hearing Judge," assigning Kinder the following rates of impairment: five percent upper extremity, three percent whole person impairment based on upper extremity, five percent lumbar neural foramina narrowing, and twenty percent post-operative neck disability. (Tr. 624-25.)  This equaled a twenty-eight percent total whole person impairment. (Tr. 625.)  Dr. Stonger also wrote that Kinder had "significant disabilities" associated with activities of daily living apart from his chronic pain problems. (Tr. 625.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On October 28, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 17-33.) She found at step one of the five-step analysis that Kinder had not engaged in substantial gainful activity since his alleged onset date. (Tr. 19.) At step two, she concluded that he had the following severe impairments: back dysfunction described as mild osteoarthritis of the lumbar spine at L4-5, Schmorl's nodes in the thoracic spine, and residual effects of anterior cervical diskectomy and decompression at C5-6 with evidence of persistent reverse lordosis, slight kyphosis, and assessments of cervicalgia; stable coronary artery disease with history of inferior myocardial infarction with stenting; left shoulder

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

dysfunction with evidence of tears of the tendons; pancreatitis; and obesity. (Tr. 19.) And at step

three, the ALJ determined that Kinder's impairment or combination of impairments was not

severe enough to meet a listing. (Tr. 22.)

Before proceeding to step four, the ALJ determined that Kinder's symptom testimony

was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the [RFC] to occasionally lift and carry 10 pounds and to
> frequently lift and carry light articles weighing less than 10 pounds. The claimant
> has the capacity to stand and/or walk up to 6 hours in an 8-hour workday and has the
> capacity to sit up to 6 hours in an 8-hour workday. The claimant has the capacity to
> occasionally push and pull up to the capacity for lifting and carrying. Considering
> the claimant's multiple complaints of pain and general lack of mobility, the claimant
> has the capacity to occasionally stoop, crouch, and climb stairs and ramps. The
> claimant has the capacity to less than occasionally kneel and crawl. The evidence
> does not establish any limitation in the ability to balance. The claimant has no
> limitations in manipulative abilities except reaching overhead is limited to less than
> occasional when considering the limiting effects of the claimant's shoulder and neck
> dysfunction. Considering the claimant's subjective complaints of dizziness, the
> claimant should have less than occasional work exposure to vibration and work place
> hazards such as unprotected heights and machinery with fast moving parts.
> Considering the claimant's subjective complaints of pain and anxiety/depression,
> mentally the claimant has the capacity to understand, remember, and carry out
> simple, routine tasks. The claimant has the capacity to appropriately interact with
> supervisors, coworkers, and the general-public. The claimant has the capacity to
> identify and avoid normal work place hazards and to adapt to routine changes in the
> work place.

(Tr. 23.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Kinder

was unable to perform any of his past relevant work. (Tr. 32.) The ALJ then concluded at step

five that he could perform a significant number of sedentary jobs within the economy, including

circuit board, surveillance system monitor, and film touch up inspector. (Tr. 33.) Accordingly,

Kinder's claims for DIB and SSI were denied. (Tr. 33.)

### C. The ALJ Properly Discounted the Treating Physician's Opinion

Kinder first takes issue with the ALJ's assessment of the various medical opinions arguing that the ALJ failed to properly explain the weight afforded to each opinion. Specifically, Kinder asserts that the ALJ's decision to afford Dr. Stonger's opinion little weight is unsupported by the record, and her explanation for why the state agency doctor opinions were given controlling weight is inadequate. Folded into these assertions is a page long conclusory argument–devoid of any analysis–that the ALJ impermissibly played doctor by offering a lay opinion on Kinder's condition.[7] Because the ALJ adequately explained the weight given to each opinion and supported her conclusions with evidence from the record, Kinder's argument fails.

"In making her decision, an ALJ must articulate, at some minimum level, her analysis of the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "She is not required to address every piece of evidence, but must provide some glimpse into her reasoning." *Id.* "Where an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion." *Id.*

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). "An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent" so

---

[7] The entirety of this argument is nothing but rote quotation to cases standing for the unremarkable proposition that an ALJ cannot play doctor; there is no analysis of how the ALJ "played doctor." Instead, Kinder copies and pastes his three page recitation of the medical evidence, which he had previously used in the opening section of his brief (it should be noted that this factual recitation is copy and pasted several times throughout the brief without any accompanying explanation or analysis). This factual recitation, however, does not even attempt to explain how the ALJ impermissibly played doctor.

long as there is some minimal articulation of her reasons for rejecting evidence of disability. *Id.* (citations omitted).

The ALJ discussed Dr. Stonger's assessments and conclusions at several points throughout her opinion, providing at least four reasons for discounting the opinion. First, the ALJ found it telling that although Kinder saw Dr. Stonger twice a week from April 23, 2010, to August 6, 2010, Dr. Stonger's notes do not indicate that a physical examination or assessment was performed or that Kinder had complained of or been treated for back pain. The absence of such complaints or assessments makes suspect Dr. Stonger's contemporaneous July 16, 2010, medical source statement and October 18, 2010, letter to the "Disability Hearing Judge" that Kinder had significant physical limitations. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (upholding ALJ's decision to give greater weight to state agency doctor's opinion because treating physician's opinion was not supported by objective medical evidence and was internally inconsistent); *Skarbek*, 390 F.3d at 503 (upholding ALJ's discounting of treating physician's opinion because it "was not well-supported by medical evidence").

Second, the record contains several letters and copies of Kinder's medical bills, which Dr. Stonger had sent to his attorney. At the hearing, Kinder explained that his insurance company was refusing to pay Dr. Stonger, and that Dr. Stonger told Kinder he would try to get it taken care of himself, but if unsuccessful, would sue Kinder to recoup the payment for his services. (Tr. 58.) From this, the ALJ opined that Dr. Stonger may have a financial interest in Kinder receiving DIB and SSI, and that it may be influencing his opinions. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. 'The patient's regular physician may want to do a favor

15

for a friend and client, and so the treating physician may too quickly find disability.'" (quoting *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985))); *see Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009) (unpublished) ("all but the most patently erroneous assessment of a treating physician's bias" are upheld).

Third, and relatedly, the ALJ found Dr. Stonger's multiple letters attesting to the severity of Kinder's injury, coupled with Kinder's insurance problems and the fact that after May 2010 Kinder was treated only by Dr. Stonger–as opposed to his specialists (i.e., Drs. Cooper and Kachmann)–indicative of Kinder's attempt to "generate evidence for this application and possible problems with his insurance paying for treatment." (Tr. 27.)

Finally, the ALJ discounted Dr. Stonger's January 30, 2009, opinion that Kinder is unable to work because it opined on an issue reserved to the Commissioner. "If the treating physician gives an opinion on an issue reserved for the ALJ, that opinion is not given controlling or special significance, because doing so would be an abdication of a role reserved for the Commissioner." *Harris v. Astrue*, No. 10 C 50229, 2012 WL 3437741, at *12 (N.D. Ill. Aug. 14, 2012) (citing *Dixon v. Massanari*, 270 F.3d at 1177; 20 C.F.R. § 404. 1527(e); SSR 96-5p;); *See Amlet v. Colvin*, No. 12 C 5249, 2014 WL 53256, at *13-16 (N.D. Ill. Jan. 7, 2014) (finding ALJ adequately articulated reasons for discounting treating physician's opinion because it was internally inconsistent and addressed issues reserved solely to the Commissioner).

Even if a treating physician opines upon an issue reserved for the Commissioner, the ALJ must still analyze the entire body of evidence considering the SSR 96-5p factors: "(1) the length, nature, and extent of the treatment relationship, (2) the frequency of examination, (3) the physician's specialty, (4) the types of tests performed, and (5) the consistency and supportability

of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009).

Here, the ALJ discussed Kinder's medical treatment history with Dr. Stonger in great length. The ALJ detailed Dr. Stonger's treatment history, the frequency and nature of the treatment, and as indicated above, gave several well-supported reasons for discounting Dr. Stonger's opinion. *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012) (unpublished) (affirming the ALJ's rejection of treating physician's opinion where it was unsupported by treatment notes, internally inconsistent, and contradicted by other evidence in the record); *West v. Colvin*, No. 10 C 5761, 2013 WL 3728807, at *12-14 (N.D. Ill. July 16, 2013) (same). Accordingly, the ALJ's reasons for discounting Kinder's treating physician are supported by the record.

Likewise, the ALJ provided sound reasons for crediting the opinions of the state agency physicians. The ALJ concluded that the state agency physical assessments were supported by the evidence both "at the time the opinions were offered as well as subsequently received evidence." (Tr. 31.) To review, Dr. Feliciano's consultative examination found that Kinder had normal gait; ability to hop and squat; ability to walk on heels, toes, and tandem; some decreased range of motion of the spine; ability to perform fine gross movements; normal fine finger skills; and full 5/5 muscle strength. (Tr. 332-33.) Likewise, Dr. Corcoran found that Kinder had no visual or upper extremity reaching, handling, fingering, or feeling limitations; could lift less than ten pounds frequently and ten pounds occasionally; stand or walk six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. (Tr. 346-52.) Dr. Nall's findings mirrored those of Dr. Corcoran. (Tr. 577-79.)

These state agency opinions are collectively consistent, and compatible with the findings

of Drs. Cooper, Kachmann and Lutz, and the objective medical evidence.  To recap, Dr. Kachmann repeatedly found that Kinder's spine had excellent fusion formation, that the instrumentation appeared excellent, and although there was minor posterior vertebral spurring, there was no nerve root displacement of significant spinal stenosis. (Tr. 363, 365, 374.)  Dr. Kachmann ultimately released Kinder for work five months after his surgery. (Tr. 27.)  Similarly, Dr. Cooper found that despite Kinder's shoulder discomfort and cervical pain, he had intact cuff strength and was otherwise nontender superiorly, and responded well to treatment.  (Tr. 411, 416, 428-30.)  Finally, although Kinder reported neck and shoulder pain to Dr. Lutz, his physical examination revealed normal sensory capabilities, full 5/5 motor power in upper extremities, and normal muscle tone and bulk. (Tr. 402-05.)

"[I]n the end, it is up to the ALJ to decide which doctor to believe–the treating physician who has experience and knowledge of the case, but may be biased, or the consulting physician, who may bring expertise and knowledge of similar cases–subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citation and quotation marks omitted).  Here, the ALJ has satisfied her requirements, providing ample support for her reasons for discounting Dr. Stonger's opinion and crediting those of the state agency physicians.

### D.  The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Kinder next argues that the ALJ's RFC failed to accurately account for the limitations caused by his back pain and inability to focus and concentrate.  Kinder also contends that because of this deficient RFC, the ALJ presented an inaccurate hypothetical to the VE. (Opening Br. 6-10.)  These arguments are without merit as the ALJ's RFC is substantially supported by the

evidence and accurately accounts for all of Kinder's limitations. Consequently, the ALJ's hypothetical properly recited Kinder's limitations.

The RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. §§ 404.1545; 416.945.

In regard to physical limitations, the assigned RFC limited Kinder to sedentary work with postural and manipulative limitations. Specifically, the RFC stated:

> [Kinder can] occasionally lift and carry 10 pounds and . . . frequently lift and carry light articles weighing less than 10 pounds. The claimant has the capacity to stand and/or walk up to 6 hours in an 8-hour workday and has the capacity to sit up to 6 hours in an 8-hour workday. The claimant has the capacity to occasionally push and pull up to the capacity for lifting and carrying. Considering the claimant's multiple complaints of pain and general lack of mobility, the claimant has the capacity to occasionally stoop, crouch, and climb stairs and ramps. The claimant has the capacity to less than occasionally kneel and crawl. The evidence does not establish any limitation in the ability to balance. The claimant has no limitations in manipulative abilities except reaching overhead is limited to less than occasional when considering the limiting effects of the claimant's shoulder and neck dysfunction.

(Tr. 23.)

Kinder argues that the ALJ should have adopted the physical limitations set forth by Dr. Stonger, who placed significant limitations on his ability to stand, sit, and reach overhead. (Opening Br. 9.) As stated above, however, the ALJ provided a proper explanation for not

19

crediting Dr. Stonger's opinion. Consequently, the ALJ's decision not to incorporate the

limitations set forth by Dr. Stonger is well-supported. *See Schmidt v. Astrue*, 496 F.3d 833, 845-

46 (7th Cir. 2007) (explaining that the ALJ is required only to incorporate into his RFC and

hypotheticals "those impairments and limitations that he accepts as credible").

Instead, it is clear that the assigned RFC incorporated the physical limitations set forth by

Drs. Nall and Corcoran. The ALJ, of course, is entitled to adopt those opinions that she credits

when issuing the RFC. *Skarbek*, 390 F.3d at 504; *Reese v. Colvin*, No. 2:12-CV-132, 2014 WL

1319364, at *10 (N.D. Ind. Mar. 27, 2014). The ALJ did depart from Dr. Corcoran's opinion in

one key area, by limiting Kinder's overhead reaching to less than occasional. But this limitation

is more conservative than that recommended by Dr. Corcoran–who placed no limitation in

ability Kinder's ability to reach overhead. And as the ALJ explained in the RFC, this more

conservative approach accommodates and accounts for Kinder's complaints of shoulder and

neck complaints. Consequently, the assigned RFC, from a physical standpoint is supported by

substantial evidence. *Firestine v. Colvin*, No. 1:13-CV-112, 2014 WL 958013, at *10 (N.D. Ind.

Mar. 11, 2014) (upholding RFC where claimant was afforded an even greater limitation than

those opined by the state agency physicians); *Coles v. Astrue*, No. 1:10-CV-321, 2011 WL

5238860, at *6-7 (N.D. Ind. Nov. 1, 2011) (finding RFC supported by substantial evidence

because it was "consistent with, and, in fact, even *more* conservative than, the limitations opined

by" the state agency physicians).

In regard to mental limitations, the RFC stated that Kinder "has the capacity to

understand, remember, and carry out simple, routine tasks . . . appropriately interact with

supervisors, coworkers, and the general-public, and . . . to identify and avoid normal work place

hazards and to adapt to routine changes in the work place." (Tr. 62-63.)  The ALJ used these limitations in stating the hypothetical to the VE. (Tr. 63.)

Kinder does not challenge the RFC regarding his mental health limitations.  Instead, he only argues that the ALJ failed to incorporate his mental health limitations in focusing, concentrating, and periods of dissociation in his hypothetical.  "When an ALJ presents a hypothetical to a VE, it ordinarily 'must include all limitations supported by medical evidence in the record,' including limitations imposed by depression." *Wynstra v. Astrue*, No. 2:11-cv-437, 2013 WL 550491, at *10 (N.D. Ind. Feb. 12, 2013) (quoting *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009)).  "The Seventh Circuit has specified that an ALJ's hypothetical question to the VE must 'account for document limitations of concentration, persistence or pace.'" *Id.* (quoting *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)).

In support of his argument, Kinder, tellingly, is unable to explain with any specificity what his mental limitations are or point to any supportive medical findings in the record. Instead, Kinder generically cites to *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) for the broad proposition that "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."

As the Commissioner points out, however, *O'Connor-Spinner* has no application here as there is no indication that Kinder has "significant problems of concentration, persistence and pace." *Id.*  Contrary to Kinder's apparent assertion, *O'Connor-Spinner* does not stand for the proposition that use of terms like "simple, repetitive tasks" constitute *per se* reversible error. *Id.* at 619 ("We have not insisted . . . on a per se requirement that this specific terminology

('concentration, persistence and pace') be used in the hypothetical in all cases."); *see Harris v. Astrue*, No. 10-CV-1154, 2011 WL 4553129, at \*10 (E.D. Wis. Sept. 29, 2011) ("*O'Connor-Spinner* does not stand for the proposition that simple, routine, low-stress, and unskilled work *cannot* account for moderate limitations in concentration, persistence, and pace." (emphasis in original)).

Here, the ALJ thoroughly recounted Kinder's history of mental impairments finding that there is no evidence he has anything other than mild symptoms. The ALJ remarked that Kinder's first complaint of a mental limitation was not until January 24, 2009, nearly nine months after his alleged onset date. (Tr. 20.) On that date, Dr. Rudolph diagnosed Kinder with posttraumatic stress disorder, major depressive disorder, and panic disorder without agoraphobia, but remarked that Kinder had good impulsivity, insight and judgment. (Tr. 481-82.)

The ALJ also noted that Dr. Shipley opined that Kinder's mental impairment caused just mild difficulties in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 536.) Significantly, Dr. Shipley stated that Kinder "alleged disability due to physical allegations only, but endorses depression and anxiety. . . . There are no medical opinions in file in regard to functional limitations brought about by any mental impairments. The claimant's reports of functioning do not suggest any severe limitations due to a mental impairment." (Tr. 538.) Finally, on October 14, 2009, Dr. Cytrynowicz prescribed Kinder with Cymbalta; thereafter, there are no further complaints of depression or anxiety. (Tr. 629-76.)

Because the record repeatedly evidences that Kinder did not have any significant limitations regarding his concentration, persistence or pace, the RFC and hypothetical adequately

accommodated for Kinder's mental limitations.  In fact, the ALJ provided some deference to Kinder's testimony regarding his depression and anxiety by limiting the hypothetical to "simple, routine tasks" even though no doctor had placed such a limitation.

Accordingly, much like the ALJ's recitation of Kinder's physical limitations, here too, the ALJ's hypothetical adequately accommodated Kinder's mental limitations. *See Renly v. Colvin*, No. 13-cv-242, 2014 WL 896615, at *2-3 (W.D. Wis. Mar. 6, 2014) (holding *O'Connor-Spinner* did not apply as claimant failed to show why mental limitations stated in hypothetical were incomplete and failed to point to evidence suggesting that he could not maintain appropriate persistence of pace); *Baker v. Colvin*, No. 1:12-cv-1814, 2014 WL 900921, at *6 (S.D. Ind. Mar. 6, 2014) (*O'Connor Spinner* did not apply where claimant's mental RFC assessment indicated that he was not significantly limited in areas concerning concentration, persistence or pace).

### E.  The ALJ's Credibility Determination is Supported by Substantial Evidence

Finally, Kinder argues that the ALJ erred in her credibility determination, arguing that the ALJ failed to consider the reasons for gaps in treatment, and improperly disregarded his subjective complaints of pain.  Like Kinder's first two arguments, this one is also unpersuasive.

Because the ALJ is in the best position to evaluate the credibility of a witness, her determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

Cir. 2006), her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine*, 360 F.3d at 754 (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

At the same time, the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. An ALJ may not reject subjective complaints of pain solely because the medical evidence does not fully support them. *Powers*, 207 F.3d at 435.

Kinder first argues that the ALJ erred by failing to consider the reasons for apparent gaps in his treatment. "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing SSR 96-7p, 1996 WL 374186, at *7). Good reasons for why the individual did not seek medical treatment "include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Id.*

Kinder contends that he lost his medical coverage in 2008 and was not granted Medicaid benefits until the end of 2009. Because he was without coverage, Kinder argues that it was improper for the ALJ to draw a negative credibility inference from his sporadic treatment.

Kinder's argument misunderstands the ALJ's reason for making an adverse credibility finding. The ALJ found that from May 2009 to April 2010, the record did not reflect that Kinder

complained of back or shoulder impairments, "despite multiple visits to his primary care provider and other physicians regarding his other impairments." (Tr. 27.) Because Kinder sought treatment for his cardiac and obesity impairments during this time frame, the ALJ concluded that regardless of any alleged medical coverage issues, Kinder was still attending other appointments.

Moreover, the ALJ coupled this credibility finding with the fact that Kinder was released back to work at the end of 2008, and that after April 2010, Kinder stopped seeing Drs. Kachmann and Cooper and received treatment exclusively from Dr. Stonger, an opinion the ALJ discounted. These three factors collectively led the ALJ to conclude that Kinder's symptoms "improved significantly after his cervical surgery." (Tr. 27.) Because the ALJ provided adequate support for his credibility determination, his finding will not be disturbed. *See Phillips v. Astrue*, 912 F. Supp. 2d 749, 764 (S.D. Ind. 2012) (upholding ALJ's finding that claimant's treatment was sporadic because ALJ provided support for her reasoning in the record); *Radford v. Astrue*, No. 1:11-cv-241, 2012 WL 2327692, at *6 (S.D. Ind. June 18, 2012) (upholding ALJ's finding that claimant's treatment was sporadic because "[t]he ALJ considered the relevant evidence and gave specific, supported explanations for his evaluation").

Finally, Kinder summarily argues that the ALJ failed to adequately weigh his subjective complaints of pain. Although an "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence," a "discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). Kinder's testimony of extreme limitations concerning his ability to lift, stand, and sit were inconsistent with all of

25

the accepted medical opinions. *See Powers*, 207 F.3d at 435 (finding that "the discrepancy between the minimal impairment expected from her conditions and her testimony on debilitating pain casts doubt on her credibility"). Accordingly, the ALJ's credibility determination concerning Kinder's subjective complaints of pain is supported by the record. *Id.* ("We will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." (internal quotations and citation omitted)).

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Kinder.

SO ORDERED.

Enter for this 15th day of August 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge